## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| M-I Drilling Fluids UK Ltd. and M-I LLC, <br><br> Plaintiffs, <br><br> v. <br><br> Dynamic Air Inc., <br><br> Defendant. | Case No. 14-cv-4857 (JRT/HB) <br><br><br> **REPORT AND RECOMMENDATION** <br><br> **FILED UNDER SEAL** |

Adam D. Swain, Scott J. Pivnick, Alston & Bird LLP, The Atlantic Building, 950 F. Street, NW, Washington, DC 20004, Patrick J. Flinn, Alston & Bird LLP, One Atlantic Center, 1201 West Peachtree Street, Atlanta, GA 30309, and Casey A. Kniser and Eric H. Chadwick, Patterson, Thuente, Christensen, Pedersen, PA, 80 South Eighth Street, Suite 4800, Minneapolis, MN 55402, for M-I Drilling Fluids UK Ltd. and M-I LLC

Alan G. Carlson, Nathan Louwagie, and Todd S. Werner, Carlson, Caspers, Vandenburgh, Lindquist, & Schuman, PA, 225 South Sixth Street, Suite 4200, Minneapolis, MN 55402, for Dynamic Air Inc.

HILDY BOWBEER, United States Magistrate Judge

## I.    Introduction

This matter is before the Court on Defendant Dynamic Air Inc.'s ("DAI") Motion for Attorney Fees and Costs [Doc. No. 285]. The matter has been referred to the undersigned for a Report and Recommendation under 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1(a) [Doc. No. 358]. For the reasons set forth below, the Court recommends granting the motion in part and denying it in part.

## II.    Background

Plaintiffs M-I Drilling Fluids Ltd. and M-I LLC[1] ("M-I") filed this case in late 2014, accusing DAI of infringing five of its U.S. patents.  (Compl. [Doc. No. 1].) Approximately three years into the litigation, the parties negotiated a settlement pursuant to which M-I agreed to dismiss its case and covenanted not to sue DAI on the asserted patents.  (Order and Opinion at 1 [Doc. No. 268].)  Chief District Judge John R. Tunheim granted M-I's motion to dismiss on September 20, 2016 [Doc. No. 269].  DAI filed a motion seeking to recover attorneys' fees and costs on the ground that the case was exceptional under 35 U.S.C. § 285 [Doc. No. 228].   This Court agreed, issuing a Report and Recommendation finding the case exceptional and concluding that DAI was entitled to recover its fees and costs. (R&R [Doc. No. 270].)  Judge Tunheim adopted that Report and Recommendation and directed DAI to file this motion itemizing its request for fees and costs and providing supporting documentation.  (Order [Doc. No. 281].)  The Court incorporates by reference the detailed factual and procedural background set forth in its Report and Recommendation and in Judge Tunheim's Order.

The Court now considers in this Report and Recommendation how much DAI should recover of the more than two million dollars in attorneys' fees and costs it states it expended in responding to M-I's claims.  M-I has objected to the reasonableness of the amounts claimed overall, but has also objected to recovery for certain activities M-I

---

[1] On November 13, 2015, M-I Drilling Fluids UK Ltd., amended its complaint to add M-I LLC, the exclusive licensee of the five asserted patents, as a plaintiff.  The Court refers to these two entities collectively hereafter as "M-I."

contends were not reasonably necessary or were not reasonably related to the federal

court litigation, including fees incurred for work done after October 15, 2015, for work

done on an unsuccessful request to file a motion for early summary judgment, and for

work done in connection with Defendant's petition for inter parties review (IPR) of the

patents-in-suit before the U.S. Patent and Trademark Office ("PTO").  M-I also objects to

DAI's request for costs in its entirety.  In sum, M-I argues that the most DAI is entitled to

is an award of $541,428.50 in fees.  (Pls.' Mem. Opp'n [Doc. No. 303].)

## III.    Attorneys' Fees

DAI seeks $1,563,118 in attorneys' fees for litigation before this Court and

$302,548.50 in attorneys' fees associated with its IPR petition before the PTO. (Def.'s

Br. Supp. Mot. Attorneys' Fees & Costs at 17, 27 [Doc. No. 286]; Ex. 6 [Doc. No. 292]

(Bassford Remele fee invoices); Ex. 19 [Doc. No. 296] (Carlson Caspers federal court fee

invoices); Ex. 20 [Doc. No. 297]) (Carlson Caspers *inter partes* review ("IPR") fee

invoices); Ex. 30 [Doc. No. 298] (Carlson Caspers federal court fee invoices).)  M-I

argues that the majority of the fees sought by DAI should be denied because it was not

reasonably necessary or reasonably related to the federal court case, or because DAI

could have taken steps earlier that would have ended the litigation. (Pls.' Mem. Opp'n at

1-2 [Doc. No. 303].)  First, M-I argues that DAI dragged its feet in discovery, which

prolonged the litigation and caused DAI's attorneys to expend unnecessary hours of work

beyond the October 15, 2017, date by which M-I asserts the lawsuit could have been

resolved.  (Pls.' Mem. Opp'n at 10-14 [Doc. No. 303].)  Second, M-I argues that DAI is

not entitled to any attorney fees incurred in connection with its IPR petition because it was neither reasonably necessary nor sufficiently related to the lawsuit. (*Id.* at 18.) Third, M-I argues that certain work performed by the Bassford & Remele law firm should be excluded from any attorneys fee award because it was duplicative of other work done by the Carlson Caspers law firm. (*Id.* at 18-19.) Fourth, M-I argues that the attorneys' fees stemming from DAI's attempted early motion for summary judgment should be excluded because the motion was premature and procedurally improper. (*Id.* at 19-20.)  Fifth, M-I argues that DAI should not be able to recover fees expended researching antitrust counterclaims and Rule 11 sanctions, because those claims were never brought. Lastly, M-I argues that both the hourly rates charged and the number of hours spent on the litigation were unreasonable, and should be reduced accordingly.  (*Id.* at 21-40.) The Court will address each of these arguments in turn.

### A.    Legal Standard

Under the American Rule, each party to a lawsuit generally bears its own expenses unless an applicable statute authorizes fee shifting. *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983). Section 285 of the Patent Act, applicable here, authorizes the award of attorney fees to the prevailing party in "exceptional cases," 35 U.S.C. § 285,[2] which courts determine "in the case-by-case exercise of their discretion," *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1758 (2014).  An exceptional case under

---

[2] "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285.

§ 285 is "simply one that stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated." *Octane Fitness,* 134 S. Ct. at 1756. A patent suit "presenting either subjective bad faith or exceptionally meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee award." *Id.* at 1757. Additionally, a case need not necessarily involve sanctionable conduct to be deemed exceptional. *Id.* at 1756–57.

Once a case has been found to be exceptional, appropriate attorneys' fees must be measured based on the "totality of the circumstances and not just discrete acts of litigation conduct." *Homeland Housewares, LLC v. Sorensen Research*, 581 F. App'x 877, 881 (Fed. Cir. 2014) (quotation omitted). The lodestar calculation provides the "guiding light" for determining reasonable attorneys' fees. *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 551 (2010). Under the lodestar method, an appropriate award of attorneys' fees is calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Id.* The number of hours reasonably expended should exclude hours that are "excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley*, 461 U.S. at 434. In determining the overall amount of a fee award, "the most critical factor is the degree of success obtained" and courts may "reduce the award to account for the limited success." *Id.* at 436-37. However, if "a prevailing party 'has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation.'" *Mathis v.*

*Spears*, 857 F.2d 749, 755 (Fed. Cir. 1988) (quoting *Hensley*, 461 U.S. at 435).

> **B.    Attorneys' Fees for Work Taking Place After October 15, 2015**

M-I argues that DAI should not receive any of the $1,324,238 in fees it incurred after October 15, 2015, the date M-I estimates it would have decided to dismiss the case had it been timely provided with discovery it alleges was withheld by DAI.[3] (Pls.' Mem. Opp'n at 10-12 [Doc. No. 303].)  In particular, M-I asserts that DAI failed to produce documents describing how the Accused Systems worked by the August 14, 2015, deadline set in the Pretrial Scheduling Order, and only provided them in early 2016 after a motion to compel.  (*Id.* at 10-11; *see also* Pretrial Scheduling Order at 2 [Doc. No. 44]; Mot. Compel [Doc. No. 135]; Order [Doc. No. 185].)  M-I also faults DAI for failing to promptly provide a Rule 30(b)(6) witness who could explain and reconcile evidence that appeared to suggest, contrary to DAI's litigation position, that DAI was involved in the allegedly infringing activities of its Brazilian affiliate Dynamic Air Limitada ("Limitada").[4]  (Pls.' Mem. Opp'n at 11 [Doc. No. 303].)  Had DAI accommodated these discovery requests, M-I insists, it would have been able more quickly to evaluate DAI's

---

[3] To arrive at the October 15, 2015 date, M-I estimates it would have decided to dismiss the case within ten days after the Rule 30(b)(6) deposition that it originally noticed for October 5, 2015. (Pls.' Mem. Opp'n at 1-2, 10-12 [Doc. No. 303].)  DAI refused to present a corporate representative in response to that notice.  M-I claims that was the principal reason the case continued beyond mid-October. M-I points out that within two weeks of taking the Rule 30(b)(6) deposition, in February of 2016, it notified DAI that it intended to voluntarily dismiss.

[4] DAI is the 51% majority owner of Limitada, a Brazilian company. (Order adopting R&R at 3 [Doc. No. 281].)  Limitada is also occasionally referred to in various filings and orders as "DAL."

6

claims of non-involvement and thereby learn it did not have a viable case to pursue. In other words, M-I argues that the hours expended after October 15, 2015, were "otherwise unnecessary," *see Hensley*, 461 U.S. at 434, and therefore should be excluded from the attorneys fee award.

DAI counters that, far from adopting a strategy of prolonging the case, it had every incentive to end the litigation as quickly as possible, and made several attempts to do so. (Def.'s Reply Br. Supp. Mot. Attorneys' Fees at 2 [Doc. No. 351].)  First, DAI points out that it moved to dismiss the case on jurisdictional grounds at the very outset of the litigation.  (*Id.*; Mot. Dismiss [Doc. No. 16].)  Later, still in the hope of bringing the litigation to an expeditious end, DAI attempted to file an early motion for summary judgment. (Def.'s Reply Br. Supp. Mot. Attorneys' Fees at 2 [Doc. No. 351].)  According to DAI, both steps make clear that its litigation strategy was geared toward resolving the case as quickly and economically as possible. (*Id.*)

DAI also disputes M-I's contention that it delayed producing technical documents, and asserts that it promptly produced all responsive engineering drawings in its possession, as indicated in its September 2015 letter to M-I. (Def.'s Reply Br. Supp. Mot. Attorneys' Fees at 2-3 [Doc. No. 351]; Werner Letter [Doc. No. 353-2].)  As for the disputed Rule 30(b)(6) deposition sought by M-I, DAI contends there was no unreasonable delay; rather, it had legitimate objections to the scope of M-I's Rule 30(b)(6) deposition notice, objections that underlay its Motion for Protective Order and Stay of Discovery [Doc. No. 106].  (Def.'s Reply Br. Supp. Mot. Attorneys' Fees at 3

[Doc. No. 351].)  DAI stresses that M-I noticed 86 different topics for the Rule 30(b)(6) deposition at issue, many of which were based on information predominantly if not solely in Limitada's possession. (Def.'s Reply Br. Supp. Mot. Attorneys' Fees at 2 [Doc. No. 351]; *see also* Werner Decl. Ex. 18 [Doc. No. 112-3].)

The Court's task, then, is to determine if and to what extent the work that took place after October 15, 2015, was "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 432.  Appropriate attorneys' fees must be measured taking into account the "'totality of the circumstances,' and not just discrete acts of litigation conduct."  *Homeland Housewares, LLC*, 581 F. App'x at 881.  In exercising this discretion, "[t]here is no precise rule or formula for determining attorney's fees."  *Evans v. Jeff D.*, 475 U.S. 717, 735–36 (1986) (citations omitted).  However, to arrive at a reasonable attorneys fee award, courts must consider, *inter alia,* "what hours were reasonably expended on what claims, whether that expenditure was reasonable in light of the success obtained, and what is an appropriate hourly rate for the services rendered." *Id.*

Here, based on the surrounding circumstances of the litigation and the various factors that made it difficult for DAI to comply with M-I's discovery requests, and with one exception discussed below, the Court finds that DAI did not improperly delay discovery and that the work that took place after October 15, 2015, was not *per se* unreasonable. As DAI consistently maintained throughout the litigation, DAI and Limitada operate independently of each other, with no overlap in officers or employees, and keep their files separately on different computer networks.  (Steele Decl. ¶¶ 8-12

8

[Doc. No. 109].)  Under those circumstances, it was reasonable for DAI to object to discovery seeking documents not within its possession or control, as DAI did here.[5]  With respect to M-I's argument that DAI's obstructionist tactics delayed the taking of the Rule 30(b)(6) deposition, DAI's objections to the scope of that deposition, set forth in its motion for a protective order [Doc. Nos. 106, 108], and its refusal to make its corporate representative available until the scope had been resolved, were also reasonable. M-I sought to depose a DAI designee on dozens of topics as to which no employee at DAI had personal knowledge. For instance, the deposition sought to cover the design, development, and manufacture of the Accused System and its installation on the U.S. flagged ships.  (Third Notice Deposition Def. Fed. R. Civ. P. 30(b)(6) ¶ 8 [Doc. No. 112-3].)  But the Accused System was solely developed and implemented by Limitada in Brazil with neither oversight nor direction from DAI.  It was therefore not unreasonable for DAI to seek a ruling from the Court in advance of the deposition regarding whether it was required to prepare its corporate representative to testify about information uniquely within the ken of Limitada, which would have required a Limitada employee to fly from Brazil to the United States to help prepare a DAI designee. (Mem. Supp. Mot. Protective Order at 13 [Doc. No. 108].)  Therefore, the Court cannot conclude that DAI's work after October 15, 2015, was *per se* excessive, redundant, or otherwise unnecessary.

---

[5] The Court did order DAI to produce certain "core" Limitada documents to which the Court concluded DAI, as majority owner of Limitada, would have had access in the ordinary course of business. *See* (Protective Order at 9 [Doc. No. 171].)

Moreover, even though M-I takes issue with DAI's responsiveness to its discovery requests, the Court has already found that M-I did not have an objectively reasonable basis to bring its claims against DAI in the first place. A district court need not limit attorneys' fees to those hours expended responding to specific acts of litigation misconduct, and may measure attorneys' fees based on the totality of circumstances of the litigation. *Homeland Housewares, LLC*, 581 F. App'x at 881; *Brasseler U.S.A. I.L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1386 (Fed. Cir. 2001). As one court held,

> Where a plaintiff's case is exceptionally weak on the merits, as here, rather than because of litigation misconduct, this rule counsels full fee-shifting from the time the case became exceptionally weak on the merits. The entire case from that point on is exceptional and the extra legal effort required to counteract the lawsuit includes the entirety of a vigorous defense.

*Tech. Props. Ltd. LLC v. Canon Inc.*, No. 14-3640, slip op. at 5 (N.D. Cal. Apr. 12, 2017). Federal courts routinely award attorneys' fees under § 285 for work done after the point at which it can be determined a patent lawsuit lacked merit. *See, e.g., Vehicle Interface Techs., LLC v. Jaguar Land Rover N. Am., LLC*, No. CV 12-1285-RGA, 2016 WL 3436396, at *1 (D. Del. June 15, 2016) (awarding attorneys' fees from the date patentee had full notice its case was objectively baseless).[6]  Awarding attorneys' fees for

---

[6] *See also Max Sound Corp. v. Google, Inc.*, No. 14-CV-04412-EJD, 2017 WL 4536342, at *13 (N.D. Cal. Oct. 11, 2017) (finding that unreasonable litigation conduct began with the filing of the frivolous complaint and awarding attorneys' fees incurred from that point forward); *Classen Immunotherapies, Inc. v. Biogen Idec*, No. CIV. WDQ-04-2607, 2014 WL 2069653, at *6 (D. Md. May 14, 2014) (awarding attorneys' fees from the date patentee knew that its claims were objectively baseless); *Precision Links Inc. v. USA Prod. Grp., Inc.*, No. 3:08-CV-00576-MR, 2014 WL 2861759, at *4 (W.D.N.C. June 24, 2014) (awarding attorneys' fees for portion of work done litigating against frivolous claims alleged by patentee); *Intex Recreation Corp. v. Team Worldwide Corp.*, 77 F.

10

expenses incurred to litigate the meritless aspects of a patent lawsuit makes sense in view of the purpose of the Patent Act's fee shifting provision, which is to "compensate[e] the prevailing party for the costs it incurred . . . where it would be grossly unjust . . . to require it to bear its own costs." *Highmark, Inc. v. Allcare Health Mgmt. Sys., Inc.*, 687 F.3d 1300, 1310 (Fed. Cir. 2012), *vacated on other grounds and remanded*, 134 S. Ct. 1744 (2014). Here, M-I's case was "exceptionally unmeritorious from the time it filed the 2014 Complaint." (R&R at 26.) Requiring DAI to bear all attorney fees incurred after October 15, 2015, on the ground that it should have produced discovery more quickly in a case it should not have had to defend in the first place would fly in the face of the statutory scheme. Therefore, the attorneys' fees expended by DAI for work done in connection with this litigation after M-I filed its complaint are potentially eligible for fee-shifting.

That being said, the Court notes that DAI's counsel represented at the pretrial scheduling conference on June 29, 2015, that DAI could and would produce engineering drawings and information concerning the materials conveyed by its systems (*see* Pretrial Scheduling Order at 2 [Doc. No. 44]), a representation that was at variance with DAI's later objections that it did not have control over those documents in Limitada's possession. While the Court does not waver from its conclusion that this litigation was

---

Supp. 3d 212, 217 (D.D.C. 2015) (awarding attorneys' fees for work done after the District Court's claim construction, after which the patentee became aware that its infringement suit was without merit); *Kinglight Holdings Inc. v. Micro-Star Int'l Co.,* CV 14-03009 JVS(PJWx), 2016 WL 6953449, at *3 (C.D. Cal. Aug. 31, 2016).

meritless from the outset, the Court is persuaded that at least some of the expense associated with the subsequent discovery disputes could have been avoided but for that offer and the back-pedalling that followed.  Therefore, the Court recommends that the fees sought by DAI in connection with the federal court litigation be reduced by $50,000.

This does not mean, however, that all *other* fees incurred after October 15, 2015, are necessarily reasonable and compensable.  The Court turns, therefore, to the other objections raised by M-I.

### C.    Attorneys' Fees for *Inter Partes* Review

DAI seeks $302,548.50 in attorneys' fees for 651.5 hours of work to prepare and file IPR petitions. (Def.'s Br. Supp. Mot. Attorneys' Fees & Costs at 27 [Doc. No. 286]; Carlson Decl. ¶ 41 [Doc. No. 297].)  Inter partes review is a legal proceeding before the PTO's Patent Trial and Appeal Board  (PTAB) whereby a petitioner seeks cancellation of some or all of the claims of a patent, either on novelty or non-obviousness grounds, based on prior art found in patents or printed publications. 35 U.S.C. § 311(b). Congress created IPR in 2011 to be a "quick and cost effective alternative[] to litigation." H.R. Rep. No. 112-98, pt. 1, at 48 (2011). To that end, IPRs are often utilized as one line of defense against an infringement claim by contesting the validity of the patent asserted. *See* 35 U.S.C. § 315(b) (authorizing IPR within one year of petitioner being served a complaint alleging patent infringement); *see also* Brian J. Love & Shawn Ambwani, *Inter Partes Review: An Early Look at the Numbers*, 81 U. Chi. L. Rev. Dialogue 93, 103 (2014) (finding that 80% of IPRs correlate with underlying litigation on the challenged patent).

12

In the instant case, M-I sued DAI for infringing five of its U.S. patents, and DAI responded in part by initiating an IPR to challenge each of the 117 claims of the asserted patents.

M-I argues that DAI is not entitled to any fees it incurred in petitioning for IPR. (Pls.' Mem. Opp'n at 18 [Doc. No. 303]; Conneely Decl. ¶ 32 [Doc. No. 329].)  Courts have awarded attorneys' fees under § 285 for legal services rendered in connection with proceedings before the PTO where doing so was reasonably necessary or related to the underlying patent lawsuit.  *See PPG Indus., Inc. v. Celanese Polymer Specialties Co*., 840 F.2d 1565, 1568 (Fed. Cir. 1988); *see also Chaffin v. Braden*, No. 6:14-0027, 2016 WL 5372540, at *2 (S.D. Tex. Sept. 26, 2016).  Here, however, M-I asserts the IPR proceedings had no bearing on the outcome of the case.  (Pls.' Mem. Opp'n at 18 [Doc. No. 303]; Conneely Decl. ¶ 32 [Doc. No. 329].)  The parties settled the lawsuit while the IPRs were still pending, and  M-I claims they did not play a significant role in the settlement. (Pls.' Mem. Opp'n at 18 [Doc. No. 303].)  Further, M-I posits that DAI pursued the IPR process for a purpose unrelated to this litigation, i.e., hoping that if the PTAB invalidated at least some of the asserted claims, it would reduce potential liability for DAI's subsidiary Limitada. (*Id*; Pivnick Dec. ¶ 14 [Doc. No. 305].)  By either view, M-I argues that the IPRs were decided too late to affect the outcome of this lawsuit, and therefore were not reasonably necessary or related to the lawsuit.

M-I additionally argues that DAI should not recover attorneys' fees for its IPR petitions because it did not move to stay the federal court proceedings while the IPRs

were pending. (Pls.' Mem. Opp'n at 16 [Doc. No. 303].)  M-I suggests that if no stay is

sought, IPR-related fees are extraneous because they do not properly allow the IPR

determination to shape the outcome of the litigation.   They note that this distinguishes

the instant case from the *PPG Industries* case, in which the Federal Circuit held that an

award of attorneys' fees for proceedings before the PTO was appropriate when the PTO

proceedings essentially "substituted for the district court litigation."  *PPG Indus., Inc.*,

840 F.2d at 1569.  *See also, Deep Sky Software*, 2015 WL 10844231, at *4 (awarding

attorneys' fees incurred in connection with PTO proceedings where the district court

stayed the litigation to await PTO guidance that could influence the outcome of the

litigation).

DAI argues that a prevailing party in an exceptional case is entitled to attorneys'

fees for IPR petitions so long as those petitions relate to the suit, regardless of whether

the case was stayed in the meantime, and regardless of whether the IPR decision directly

influenced the outcome of the lawsuit. (Def.'s Br. Supp. Mot. Attorneys' Fees & Costs at

27 [Doc. No. 286].)  *Cf. Cent. Soya Co. v. Geo. A. Hormel & Co.,* 723 F.2d 1573, 1578

(Fed. Cir. 1983).  DAI urges that its IPR-related attorneys' fees are directly related to the

suit because they were incurred in support of a patent invalidity defense to the

infringement claims M-I asserted in its complaint.  Moreover, DAI argues, it actually

attempted to save money by seeking inter parties review because IPR proceedings are

more cost effective than federal court litigation. (Def.'s Br. Supp. Mot. Attorneys' Fees &

Costs at 15 [Doc. No. 286].)  As for its failure to file a motion to stay, the PTAB did not

institute the IPR until after M-I had agreed to dismiss the case.  (Pivnick Decl. ¶ 12-14 [Doc. No. 305].)

Taking into account the "totality of the circumstances" of this case, the Court recommends that DAI not be awarded its attorneys' fees incurred to prepare and file its IPR petitions.[7]  DAI overgeneralizes the circumstances in which courts have been willing to award IPR-related attorneys' fees in exceptional cases. In the handful of district court cases DAI cites, courts typically awarded attorneys' fees associated with PTO proceedings either where there was a stay of the related district court case, such that the PTO proceedings effectively took the place of the federal court litigation,[8] or where the court determined the PTO's decision played a central role in determining the outcome of the federal court case.[9]  While in one case cited by DAI, the district court awarded attorneys' fees for a reexamination based on "the extent of the effort required to defend against the objectively baseless claim,"  the court did not comment on whether the outcome of the reexamination was central to the court's ultimate conclusion regarding the merits of the case.  *IA Labs CA, LLC v. Nintendo*, No. CIV. PJM 10-833, 2012 WL

---

[7] M-I also argues that any fee shifting award should exclude the extra and unnecessary hours that DAI billed in its last minute rush to file the IPRs in time to meet the filing deadline. M-I specifically argues that DAI's delay necessitated the use of more lawyers than would otherwise be necessary had DAI planned properly, and also required special costs to expedite its petitions. Because the Court does not find that any IPR fees should be awarded, it does not need to reach these arguments.

[8] See, e.g., *PPG Indus., Inc.*, 840 F.2d at 1569; *Deep Sky Software*, 2015 WL 10844231, at *2.

[9] See, e.g., *Howes v. Med. Components, Inc.*, 761 F. Supp. 1193, 1198 (E.D. Pa. 1990); *Scott Paper Co. v. Moore Bus. Forms, Inc.*, 604 F. Supp. 835, 838 (D. Del. 1984).

1565296, at *4 (D. Md. May 1, 2012), *aff'd*, 515 F. App'x 892 (Fed. Cir. 2013). Here, the basis for the Court's determination that the case was objectively baseless was the absence of sufficient grounds to believe that DAI was itself involved in any of Limitada's allegedly infringing activity. The Court did not find – and DAI did not argue – that the lawsuit was baseless because M-I should have known the patents were invalid. While, as will be discussed in greater detail below, DAI was not required to "pick just one horse" and forgo developing other litigation defenses to M-I's claims, the Court concludes under the circumstances of this case that an award of attorneys' fees incurred in connection with DAI's attack on the patents in an entirely different forum, while the lawsuit continued in the district court and was ultimately resolved for reasons that had nothing to do with the IPR proceedings, would go too far.[10] Accordingly, the Court recommends that the $302,548.50 in attorneys' fees incurred in connection with the IPR petitions be excluded from the award of attorneys' fees to DAI.

### D. Bassford Remele's Fees Incurred after May 6, 2015

DAI seeks $5,016 in fees for time billed by Bassford Remele after May 6, 2015. (Pls.' Mem. Opp'n at 19 [Doc. No. 303].) Attorneys from Carlson Caspers began billing

---

[10] DAI also relies on *Central Soya* for the proposition that attorneys' fees may include "sums that the prevailing party incurs in the preparation for and performance of legal services related to the suit." 723 F.2d at 1578. But the Federal Circuit in *Central Soya* was determining whether the district court erred in including $29,000 in of general expenses in the attorneys' fees awarded pursuant to §285. *Id.* It was not considering an award of several hundred thousand dollars in attorneys' fees incurred in connection with PTO proceedings that had little if any bearing on the outcome of contemporaneous federal court litigation.

16

on this matter on April 22, 2015, and entered an appearance on May 5, 2015. (*Id.*; Ex. 6 [Doc. No. 292].) Attorneys from Bassford Remele continued to bill on the matter for an additional five months "to help the attorneys at Carlson Caspers get up to speed." (Hickey Decl. ¶ 6 [Doc. No. 289].)  M-I argues that nearly all of this time duplicated work being done by attorneys at Carlson Caspers.  M-I cited one case in support of this argument, *Howes v. Med. Components, Inc.*, 761 F. Supp. 1193, 1198 (E.D. Pa. 1990). In that case, the court found that co-counsel duplicated efforts and that the fee claimants failed to prove the services were reasonably expended.  Here, the Court finds the $5,016 expended by Bassford Remele after May 6, 2015 to be reasonable.  In complex patent litigation spanning two continents, it does not seem unreasonable that there should be some moderate amount of overlap in tenure between the original counsel and the team of patent litigators subsequently hired to take over the suit, to assure that the latter are fully briefed on what had transpired before they entered the fray, and to allow for consultation during the transition as new questions arose. Therefore, the Court recommends that the district court not exclude from the award to DAI the $5,016 in fees billed by Bassford Remele after May 6, 2015.

### E.    DAI's Summary Judgment Motion

M-I argues that DAI should not be reimbursed for $47,827.50 in fees in connection with its attempt to file an early motion for summary judgment of non-infringement. (Pls.' Mem. Opp'n at 19 [Doc. No. 303].)  It points out that the attempted motion was procedurally improper because DAI failed to ask for permission to file it, as

required by the Pretrial Scheduling Order,[11] and because DAI had not produced overdue

discovery. (Pls.' Mem. Opp'n at 5, 19-20 [Doc. No. 303].) M-I further contends the

motion could not have been successful in any event because the evidence M-I had in its

possession at that point created a genuine dispute of material fact that precluded summary

judgment of non-infringement. DAI acknowledges it failed to seek permission from the

Court before filing the motion, and that the Court denied its belated request for

permission on the ground that discovery was not yet complete. (Order Den. Def.'s Mot.

Summ. J. [Doc. No. 122].)

It is difficult to estimate how much DAI would have incurred in attorney fees had

it followed the process required by the Pretrial Scheduling Order. A prevailing party is

entitled only to reasonable attorneys' fees, and thus extraneous or unnecessary fees

should be excluded from any award. *Hensley*, 461 U.S. at 434. Legal fees incurred

preparing a procedurally improper motion certainly involve unnecessary expense. If DAI

had followed the requirements of the Pretrial Scheduling Order, asking permission rather

than forgiveness, the motion would not have been filed. On the other hand, at least some

of the work associated with preparing the motion would have been necessary in any event

to prepare a meaningful request for permission. Therefore, the Court recommends

---

[11] The Pretrial Scheduling Order required that before a motion for summary judgment
could be filed, the moving party must first seek permission by filing a letter to the Court
of no more than 3 pages, briefly stating the basis for the motion, verifying that discovery
was complete as to the issue or issues sought to be raised, and explaining why the motion
would advance the expeditious resolution of the lawsuit. (Pretrial Scheduling Order at 13
[Doc. No. 44].)

reducing by 75% the $47,827.50 in attorney fees billed in connection with the summary judgment motion, leaving $11,956.88 to be included in the award to DAI.

### F.    Fees for Unasserted Antitrust Counterclaims and a Rule 11 Letter

DAI seeks $32,856 in fees for time billed in connection with exploring possible antitrust counterclaims and a Rule 11 violation letter; the former were never asserted and the latter was never served.  Courts have recognized generally that fees should be awarded only for hours "expended in furtherance of successful claims, or of claims closely related to successful claims."  *Whitworth v. Nat'l Enter. Sys.*, No. CV 08-968-PK, 2010 WL 1924505, at *6 (D. Or. Apr. 21, 2010), *R&R adopted*, 2010 WL 1923673 (D. Or. May 11, 2010) (citing *Sloman v. Tadlock*, 21 F.3d 1462, 1474 (9th Cir. 1994)). However, courts have also recognized that parties should not be penalized "for pursuing one defense theory over another." *Kinglite Holdings Inc. v. Micro-Star Int'l Co., No.* CV1403009JVSPJWX, 2016 WL 6953449, at *3 (C.D. Cal. Aug. 31, 2016) (citing *Home Gambling Network, Inc. v. Piche*, No. 2:05-cv-610-DAE, 2015 WL 1734928, at *9 (D. Nev. Apr. 16, 2015). Here, the Court does not find these exploratory forays, the output of which apparently did not see the light of day in this litigation, to be sufficiently related to the underlying patent infringement matter.  Accordingly, the Court recommends that the fee award to DAI not include the $32,856 in fees related to unasserted antitrust counterclaims and the unserved Rule 11 violation letter.

19

### G.      Litigation of Disputes Relating to Inspection of the Accused Systems

M-I argues that DAI filibustered its efforts to inspect the Accused Systems located

on two ships that were in port in Brazil, resulting in unnecessary litigation expense for

which M-I should not be compensated.  (Pls.' Mem. Opp'n at 20 [Doc. No. 303].)  In the

late summer of 2015, M-I and DAI engaged in a contentious dispute regarding whether

and how M-I would be able to gain access to and inspect two ships—the HOS Resolution

and the HOS Pinnacle—upon which the Accused Systems had been installed. (R&R 33-

35; Pivnick Decl. ¶¶ 15-24 [Doc. No. 305].)  M-I contends DAI prevented it from

inspecting the ships, made no effort to attempt to comply with M-I's June 26, 2015,

Notice of Inspection, did not fully comply with this Court's order requiring that it attempt

to facilitate an inspection, and provided incomplete or misleading information regarding a

scheduled inspection that ultimately was not successful. (Pivnick Decl. ¶¶ 15-24 [Doc.

No. 305].)  According to M-I, at each step DAI obstructed or delayed its efforts to seek

discovery to which it was entitled, and the $158,045.50 fees incurred by DAI in doing so

were unnecessary and should not be reimbursed. (Pls.' Mem. Opp'n at 21 [Doc. No.

303].)

For its part, DAI insists it had no power to arrange the inspections M-I demanded,

and, given the circumstances, it did the best it could to accommodate M-I's requests.

(Def.'s Reply Br. Supp. Mot. Attorneys' Fees at 4 [Doc. No. 351].)  Further, DAI asserts

that it reiterated this point to M-I throughout the litigation, making clear it had no power

to grant the inspections.  The ships in question were owned by Hornbeck Offshore

Services, Inc. and leased to Petrobras, the Brazilian government-owned oil company.

DAI stressed to M-I that it had no involvement with the ships at all, and even Limitada's

operations constituted only a small portion of the activities performed on the ships.

(Carlson Decl. Ex. 31 ¶¶ 1-4 [Doc. No. 295-22].)   With these considerations in mind,

this Court previously determined in its February 2, 2017, Report and Recommendation

that DAI did not act in an obstructive manner during the inspections, finding that,

although "DAI and its counsel may well not have done all that the Court's Order

required," there was no reason to believe additional efforts by DAI would have secured

the inspections M-I sought. (R&R at 35 [Doc. No. 270].)   Granted, the fees attributed to

this chapter of the case are high.   But the docket contains no less than two dozen entries

relating to the disputes over the requested inspections, most of which are motions or

responses to motions brought by M-I that seek sanctions up to and including default

judgment against DAI for the "spoliation of evidence" allegedly resulting from DAI's

failure to arrange for the inspections.   *See, e.g.,* Def.'s Mem. Opp'n Order Compel at 17

[Doc. No. 80].   Based on these considerations, and the Court's previous determination

that DAI could not compel Hornbeck or Petrobras to permit the inspections and that it did

not act unreasonably in its response to M-I's demands that it attempt to do so, the Court

recommends not excluding from the award to DAI the fees billed in connection with

those disputes.

**H.       Reasonableness of Attorneys' Billing Rates and Hours Billed**

**1.       Value of the Patent Litigation**

Courts exercise considerable discretion in determining the reasonable amount of attorneys' fees expended by a prevailing party. The value (or exposure) of a lawsuit can be an important consideration in that determination: the higher the stakes in litigation, the more justified the party is in expending resources. *Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, No. CIV. 05-2310 DSD/JJG, 2011 WL 1321387, at *4 (D. Minn. Apr. 4, 2011) ("Indeed, courts may consider the value of the litigation as one factor in determining the reasonableness of attorneys' fees.").  The American Intellectual Property Law Association has found, not surprisingly, that the amount spent in defending against patent infringement claims increases with the value of the lawsuit.  Am. Intellectual Prop. L. Ass'n, *Report of the Economic Survey* 41 (2015).  Here, DAI claims it faced $37 million in damages if M-I were to prevail, because the contract awarded to Limitada that implicated the allegedly infringing technology had a potential value of $37 million. (Def.'s Br. Supp. Mot. Attorneys' Fees & Costs at 7 [Doc. No. 286]; Steele Decl. ¶ 8 [Doc. No. 109].)  Indeed, DAI contends that it was "in a fight for its very existence" against one of the world's largest oilfield services companies. (Def.'s Br. Supp. Mot. Attorneys' Fees & Costs at 6–7 [Doc. No. 286].)  Thus, DAI's expert opines, it was reasonable for DAI to devote over $2 million in attorneys' fees and costs to defending against M-I's claims. (Liebman Decl. ¶ 25 [Doc. No. 300].)

22

M-I argues that DAI vastly overstates its exposure in this litigation. (Pls.' Mem. Opp'n at 9 [Doc. No. 303].)  M-I points out that although the contract with Petrobras stated the maximum potential revenue for Limitada was $37 million, only a small part of the work to be performed under the contract implicated U.S. patent rights because the United States District Court had jurisdiction over only the two U.S.-flagged ships. (Pls.' Mem. Opp'n at 9 [Doc. No. 303].)  Therefore, M-I estimates DAI's exposure to be only $3 - $5 million, from which they conclude that reasonable fees through the end of discovery should have been somewhere in the neighborhood of $1 million, based on industry data. (DAI Ex. 10 at 37 [Doc. No. 295-4].)  M-I, however, does not provide any authority or detailed explanation of how it arrived at this estimate of DAI's exposure, other than to estimate in some fashion the value of the activities performed on the two U.S.-flagged ships.  The Court agrees that DAI's exposure was probably not the full $37 million in revenue identified in the Petrobras contract, if for no other reason than that it does not appear to account for the costs of labor, materials, and overhead associated with the performance of the contract.  On the other hand, M-I's estimate based on the activities aboard the two U.S.-flagged ships significantly underestimates the extent of DAI's exposure: it overlooks that M-I amended its complaint to allege indirect infringement claims under 35 U.S.C. § 271(f)(1) that sought to encompass activities involving the Accused Systems outside the United States.  *See, e.g.,* Am. Compl. [Doc. No. 173] at ¶¶ 73, 74. The Court need not determine with exactitude the value of the litigation in order to assess the reasonableness of the fees incurred by DAI, however.  For these purposes, it

23

is sufficient that the Court is satisfied that DAI's potential litigation exposure was significantly greater than the $3-$5 million range asserted by M-I.

### 2.    Carlson Caspers' Billing Rates

M-I argues that DAI's fees must be reduced because the rates charged by Carlson Caspers' partners are unreasonable for this forum. A reasonable hourly rate is an "amount to which attorneys of like skill in the area would typically be entitled for a given type of work." *Jorstad v. IDS Realty Tr.*, 643 F.2d 1305, 1313 (8th Cir. 1981) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 471 (2d Cir. 1974)). In determining whether an hourly billing rate is reasonable, a court should determine the lodestar figure for the "prevailing market rates in the relevant community."  *Bywaters v. United States*, 670 F.3d 1221, 1232 (Fed. Cir. 2012) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). Further, the fee claimant must provide evidence that its requested rates are "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  *Owner-Operator Indep. Drivers Assoc., Inc. v. Supervalu, Inc.*, No. 05-cv-2809 (JRT/JJG), 2012 WL 6760098, at *6 (D. Minn. Sept. 30, 2012).

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████ (Pls.' Mem. Opp'n at 22 [Doc. No. 303].) The parties present competing expert declarations from prominent intellectual property litigators in the Twin Cities legal market on the reasonableness of billing rates. *Compare* Conneely

Decl. ¶ 36 [Doc. No. 329] *with* Liebman Decl. ¶¶ 13-17 [Doc. No. 300].  However, neither the declarations nor the exhibits include in-depth evidence of billing rates for patent litigators in Minneapolis. One exhibit does include region-specific average hourly billing rates for intellectual property partners at law firms in the Twin Cities region, but the data aggregates rates for less costly prosecutors as well as more costly litigators. (DAI Ex. 10 at 25 [Doc. No. 307-7].)  Interestingly, M-I does not offer a declaration comparing the billing rates charged by its own litigators in this case, several of whom came from outside the Twin Cities and made regular appearances at hearings.

After a careful review of the declarations, the Court finds that the hourly rates charged by DAI's attorneys at Carlson Caspers are not out of step with the rates of similarly experienced patent litigators in the Twin Cities legal market.  Patent litigation is an area of law requiring a particularly high degree of skill and specialization, which are reflected in the hourly rates charged by practitioners in this field.  *See Olson v. Messerli & Kramer, P.A.*, No. 07-CV-0439 PJS/RLE, 2008 WL 1699605, at *2 (D. Minn. Apr. 9, 2008) (observing that lawyers in certain areas of practice, such as patent and antitrust litigation, "charge a lot more than lawyers in other areas of practice").  Moreover, while there may be some regional variability, experienced patent litigators, particularly those with significant trial experience, often have a national practice, making narrow local market assessments less instructive than in other types of litigation.  The Court acknowledges that hourly rates for patent litigators are often exceptionally high, as evidenced by the Liebman declaration, but that does not make them unreasonable.

Therefore, the Court does not recommend reducing the attorneys' fees sought by DAI on the basis that the hourly rates charged by Carlson Caspers were unreasonably high.

### 3.    Carlson Caspers' Number of Hours

M-I argues that both the total number of hours expended by Carlson Caspers attorneys and the distribution of those hours among senior versus junior attorneys were unreasonable. The party moving for attorneys' fees "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley*, 461 U.S. at 437. Based on the movant's showing, the court may reduce the number of hours included in the calculation of reasonable attorneys' fees in a patent case in light of what it deems to be reasonable to the case. *See Maxwell v. Angel-Etts of Cal., Inc.*, 53 F. App'x 561, 568 (Fed. Cir. 2002). "In cases where the fee application is complex, the district court is not required to do a line-by-line analysis, but may make across-the-board cuts, so long as its sets forth a concise reason for its cuts." *Id.* Additionally, fees incurred to prepare a motion for attorneys' fees are compensable under § 285, particularly when a motion for attorneys' fees requires the party to summarize and analyze a complex case and a large volume of invoices. *See, e.g., Mathis v. Spears*, 857 F.2d 749, 756 (Fed. Cir. 1988).

In opposing DAI's motion for attorneys' fees, M-I objects to the reasonableness of the hours billed by Carlson Caspers for a number of reasons. First, M-I argues the IPR fees are not reasonable because DAI waited until the last minute to prepare and file the IPRs, causing DAI to spend additional time and utilize additional attorneys. (Pls.' Mem.

26

Opp'n at 27 [Doc. No. 303].)  As already discussed, the Court does not recommend

granting attorneys' fees for the IPR petitions in this matter, and therefore will not address

whether those fees were otherwise excessive.

Second, M-I argues that the ratio of hours billed by senior partner Alan Carlson

compared to other less expensive attorneys on the case was too high. (Pls.' Mem. Opp'n

at 29-30 [Doc. No. 303].)  Of the three primary attorneys billing time to this matter,

Carlson billed 1,019 hours, junior partner Todd Werner billed 1,066 hours, and first-year

associate Nathan Louwagie billed 1,214 hours. (*Id.*)  Carlson accounts for 26% of the

hours expended, but when multiplied by his billing rate, he accounts for 48% of the fees.

(*Id.*)  According to M-I, that Carlson billed roughly the same number of hours as less

experienced attorneys on the case is unreasonable because a senior partner should assign

a much larger ratio of the work to lower level attorneys.

The Federal Circuit has stated that fees should be reduced where partners perform

work more appropriate for junior attorneys.  *Large Audience Display Sys., LLC v.*

*Tennman Prods., LLC*, 660 F. App'x 966, 973 (Fed. Cir. 2016) (remanding to determine

if lopsided ratio of partner hours to associate hours was reasonable).  But DAI insists

Carlson's level of involvement was reasonable and appropriate. Carlson points out that

the two areas on which he spent the bulk of his time were DAI's response to M-I's

accusations of spoliation in connection with the ship inspection disputes (146.4 hours),

and DAI's motion seeking to have the case declared exceptional and to recover its

attorneys' fees (257 hours). (*Id*; Carlson Decl. ¶¶ 38-39 [Doc. No. 294]; Carlson Supp.

27

Decl. ¶¶ 1-7 [Doc. No. 353].)  According to DAI, these issues were top priorities for the client and "akin to dispositive motions" in terms of their importance to the case. Thus, it argues, Carlson's direct involvement as the most experienced attorney on the case was entirely appropriate and even necessary to meet the client's expectations. (Def.'s Reply Br. Supp. Mot. Attorneys' Fees at 8 [Doc. No. 351].)

Turning first to the fees sought in connection with DAI's motion for attorneys' fees, M-I contends that the total number of hours and fees billed by Carlson Caspers attorneys on the motion – approximately 650 hours amounting to $320,868 in fees, or nearly 28% of the total fees billed on the case as a whole – was excessive.  They further contend that the fees are unnecessarily high in part because Carlson personally billed 152.9 hours to draft the motion and 104.4 hours to prepare for oral argument.  Carlson's hours amounted to approximately 40% of the time spent on the motion and 63% of the fees.  M-I argues that reflects a disproportionate level of involvement by the senior partner.  (Pls.' Mem. Opp'n at 31 [Doc. No. 303].)

DAI acknowledges it spent a very high number of hours on the Motion for Attorneys' Fees, although it insists the 654.9 hours calculated by M-I is overstated because it includes billings for work that did not relate to the attorneys' fees motions. (Def.'s Reply Br. Supp. Mot. Attorneys' Fees at 8 [Doc. No. 351].)[12]  Additionally, DAI

---

[12] On the other hand, it is likely that the number of hours expended on the Motion for Attorneys' Fees was actually even higher, because M-I's calculation of time does not include hours spent responding to M-I's objections to this Court's Report and Recommendation.

argues that the extra effort on a successful motion to shift attorneys' fees, by the team as a whole and by Carlson in particular, was entirely justified, as it would be expected to have an outsized impact on the bottom line of a midsided company like DAI. (*Id.* at 9.)

The Court does not disagree that this motion and its outcome were of critical importance to DAI, and therefore warranted a robust investment of attorney time, including Carlson's significant direct involvement, in light of what was at stake for their client. However, the Court agrees with M-I that the total number of hours spent on the motion was excessive, and that the hours spent by Carlson himself were disproportionate. The fact that an attorney is an experienced and respected trial lawyer does not automatically justify having that attorney spend hundreds of hours on drafting motion papers or Powerpoint presentations, even on a critical issue. The Court accepts for the sake of argument that Carlson may have had the greater command of the facts and documents, and as lead trial counsel was certainly best positioned to direct the overall approach and strategy for this important motion. But the high billing rates of the other attorneys on the file suggest they were fully capable of providing the level of advocacy required to do the lion's share of the work in preparing those materials, even while allowing for significant strategic oversight by Carlson, whose own billing rate was an order of magnitude higher.

Furthermore, even though it was entirely appropriate for Carlson, as the lead trial counsel, to handle the oral argument, the Court finds the time spent in preparation for the oral argument was also excessive. After having spent more than 150 hours working on

the motion itself, Carlson spent more than one hundred additional hours to prepare for the hearing, much of which appears to have been invested in a dense 25-slide Powerpoint presentation (Carlson Supp. Decl., Ex. 37 [Doc. No. 353-1]) that was longer than could be covered in the time allotted for the hearing by the Court.[13]   In fact, DAI submitted the slides at the conclusion of the hearing because counsel did not have time to present them, and M-I objected on the ground that the slides covered arguments that were not included in the briefing, and constituted an impermissible supplement to the written and oral argument to which it did not have the opportunity to respond.  The Court discarded the slides submitted by DAI and issued its R&R on DAI's motion without considering them.

The Court therefore recommends that the fees incurred in connection with the motion for attorneys' fees, including both the drafting of the motion papers and the preparation for oral argument, be reduced by 35% to adjust for the excessive number of hours overall and the disproportionate involvement of senior counsel at the highest billing rate, resulting in a monetary reduction of $112,303.80.  The Court finds that the resulting award of $208,564.20, while still high, is more in line with what would be reasonable for the preparation and presentation of that motion, taking into account its successful outcome and its importance to DAI.

---

[13] The Court's Practice Pointers state that "[a]s a general rule, Magistrate Judge Bowbeer schedules . . . an hour for a hearing on a dispositive motion. You must inform the Courtroom Deputy well ahead of time if you anticipate that more time should be allowed, so that Magistrate Judge Bowbeer and court personnel can arrange their schedules accordingly."  Neither party's counsel called chambers ahead of time to ask the Court to allow additional time for their argument.

M-I similarly argues that the 146.4 hours Carlson spent on the parties' disputes over the ship inspection, which included the motion practice and the charges of spoliation relating thereto (Carlson Supp. Decl. ¶¶ 1-7 [Doc. No. 353].), was also excessive, although it does not provide any explanation other than to state in conclusory fashion that "[t]his amount of time for the senior partner in the case is excessive and unreasonable and should be excluded from any recovery." (Pls.' Mem. Opp'n at 32 [Doc. No. 303].)  As with the motion for attorneys' fees, the Court agrees that the inspection dispute and related motion practice was a serious matter that warranted Carlson's direct involvement. Furthermore, as already noted, there were more than two dozen docket entries that dealt, in whole or in part, with this dispute.  Clearly, it was also of key importance to M-I, which filed motions seeking case-dispositive sanctions for alleged spoliation. Furthermore, it appears that Carlson had the primary role in communicating with DAI and Limitada, and in turn with M-I and the Court, about the efforts made to comply with the Court's order.  The Court has already recommended a reduction in the award of fees attributable to the various skirmishes concerning the ship inspections, but does not recommend any further reduction based on M-I's argument that Carlson's role in managing DAI's response to those disputes was excessive.

M-I contends that many of the other tasks done by Carlson should also have been done instead by more junior attorneys at a lower cost to the client. (Pls.' Mem. Opp'n at 32 [Doc. No. 303].)  In particular, M-I takes issue with the time Carlson spent responding to interrogatories and document requests, and that he billed roughly $42,660 reviewing

M-I's document production and $15,484 for tasks relating to the scheduling order— all tasks M-I contends could and should have been delegated to a more junior attorney. (Pls.' Mem. Opp'n at 32 [Doc. No. 303]; M-I Ex. Y [Doc. No. 323]; M-I Ex. Z [Doc. No. 324].)

In his supplemental declaration, Carlson responds that he reviewed only documents that were material to the case and did not do rote document review as M-I's argument implies. (Carlson Supp. Decl. ¶ 12 [Doc. No. 353].)  Further, Carlson asserts that examining the documents themselves, as opposed to summaries from other attorneys, was necessary for the case. The patents and technology placed at issue in the litigation were new to both Carlson and his client, DAI. Therefore, to properly prepare, he had to learn about the technology, the patents, and their application to the industry from information provided by M-I in discovery. (*Id*.)

After reviewing the invoices, the Court finds that with the exceptions discussed above, Carlson appears to have performed work that was appropriate for the partner-in-charge of a large patent lawsuit.  Furthermore, contrary to M-I's suggestion that responsibility for the party's input into the pretrial scheduling order should be relegated to more junior attorneys, the Court is of the view that significant input by lead counsel into case planning and scheduling early in the case is to be encouraged.  As such, the Court does not recommend reducing the award for Carlson's involvement in discovery and document review and with respect to the scheduling order.

Next, M-I argues that attorneys other than Carlson billed excessive time on this case as well. It makes several arguments in this regard. First, it contends there was a disproportionate amount of time spent on the case after May 26, 2016, when M-I notified DAI that it would no longer pursue the case. (Pls.' Mem. Opp'n at 33-34 [Doc. No. 303].) DAI counters that the only specific example M-I proffers of purportedly excessive time spent after May 26, 2016, is the motion for attorneys' fees. The Court has already addressed the reasonableness of the time spent on that motion and recommended an adjustment.

M-I next argues that Carlson Caspers overstaffed the case. "[T]he number of attorneys alone does not affect the reasonableness analysis; what matters is the number of efficient hours worked on non-duplicative services." *Jenkins v. Univ. of Minn.*, No. CV 13-1548 (JRT/SER), 2017 WL 4657853, at *3 (D. Minn. Oct. 13, 2017). However, some courts have refused to reimburse fees for attorneys who perform *de minimis* work on a case. *See, e.g., Bores v. Domino's Pizza LLC*, No. 05-2498 RHK/JSM, 2008 WL 4755834, at *7 (D. Minn. Oct. 27, 2008). Here, M-I argues that duplicative and inefficient hours were expended due to the crowd of attorneys—nineteen different Carlson Caspers timekeepers and five different Bassford Remele timekeepers—that were involved in this case. More specifically, M-I argues that compensable fees should be limited to the work done by the three main Carlson Capsers attorneys (Alan Carlson, Todd Werner, and Nathan Louwagie) and the three main Bassford Remele attorneys (Kevin Hickey, Steven Aggergard and Aram Desteian). (Pls.' Mem. Opp'n at 35-36

[Doc. No. 303].)  The rest of the timekeepers, according to M-I, performed *de minimis* work that should not be included in the fee award.

The Court acknowledges that the risk of having numerous timekeepers on a given case is that each new timekeeper may spend time "getting up to speed" on the case, which can be much less efficient than having a smaller number of timekeepers doing a greater share of the work. But DAI responds that the attorneys tasked for minor work on the case did not waste time getting up to speed because they worked on discrete projects that did not require knowledge of the underlying facts of the dispute between M-I and DAI, and that there is no indication in the invoices that those timekeepers billed time for "getting up to speed." (Def.'s Reply Br. Supp. Mot. Attorneys' Fees at 9 [Doc. No. 351].) Further, DAI notes that M-I was unable to identify any examples of unnecessary tasks performed by any of the "supplemental attorneys." (*Id.*)

The Court finds that the distribution of work to the various different timekeepers was reasonable.  Carlson Caspers and Bassford Remele have provided detailed descriptions of the work done by its attorneys on the case.  After careful review of the record, the Court does not observe a pattern of duplication or noticeable inefficiency. Both firms appear to have largely avoided the inefficiency that can come with multiple timekeepers by tasking minor timekeepers with discrete projects that did not require duplicative ramp-up time, such as pure legal research projects or technical consults, *see, e.g.* (DAI Ex. 19 at 21 (Christopher Pinahs Sept. 7, 2015, billing regarding rule for

34

location of 30(b)(6) deposition); DAI Ex. 19 at 36 (Chris Winkels Oct. 30, 2015, review
of patents)).

M-I also contends the three main attorneys assigned to the case duplicated efforts,
such as by having multiple attendees at depositions and hearings and multiple
contributors to briefs, and that their fees should be reduced accordingly. DAI responds it
was reasonable for multiple attorneys to contribute to briefs, depositions, and hearings.
Further, DAI argues that M-I's position is not consistent with its own practices in the
case. DAI observes that M-I itself had multiple attorneys at depositions and hearings,
most of whom had to travel from out of town to attend the hearings. (Carlson Supp. Decl.
¶ 21 [Doc. No. 353].)

DAI typically staffed hearings with two lawyers, and only once in the litigation
staffed a hearing with three lawyers. (DAI Ex. 19 at 25 [Doc. No. 296]) (recording that
three Carlson Caspers attorneys attended the September 18, 2015, hearing on the motion
to compel).) While there is no hard and fast rule, courts have generally found in complex
litigation that the attendance of two attorneys at a hearing is reasonable but that three may
be overkill. *See, e.g., Gorman v. Easley*, No. 95-0475-CV-W-3, 1999 WL 34808611, at
\*5, \*7 (W.D. Mo. Oct. 28, 1999); *Hagen v. Messerli & Kramer, P.A.*, No. CIV. 14-863
DSD/JSM, 2015 WL 1963057, at \*2 (D. Minn. Apr. 30, 2015); *Project Vote/Voting for
Am., Inc. v. Long*, 887 F. Supp. 2d 704, 714 (E.D. Va. 2012).

Here, the Court does not find a pattern of overstaffing hearings or depositions.
Furthermore, although the invoices reflect that multiple attorneys had input on written

35

work product, as DAI points out, the carefully managed assistance of multiple different attorneys on distinct tasks can result in superior and even economical service to the client. After reviewing the record, the Court does not find a pattern of duplication sufficient to warrant a fee reduction and recommends against reducing the award on that basis.

Finally, M-I urges the Court to discount DAI's request for fees due to inadequate work descriptions in the attorneys' "block billing." "[B]lock billing is the lumping together of daily time entries consisting of two or more task descriptions." *King v. Turner*, No. 05-388 (JRT/FLN), 2007 WL 1219308, at \*3 (D. Minn. April 24, 2007). On one hand, "[i]t is not unusual for attorneys in the Twin Cities to bill clients using a block-billing format" and the practice has generally been accepted by courts in this District. *North Dakota v. Heydinger*, No. 11-CV-3232 (SRN/SER), 2016 WL 5661926, at \*18 (D. Minn. Sept. 29, 2016); *see also, Zerorez Franchising Sys. v. Distinctive Cleaning, Inc.*, No. 13- 2326, 2016 U.S. Dist. LEXIS 60644, at \*21 (D. Minn. May 6, 2016). On the other hand, regardless of whether block billing is utilized, the party seeking to shift attorneys' fees must demonstrate that the number of hours it worked was reasonable. *Hensley*, 461 U.S. at 433–34. "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Id.* at 433.

DAI argues that its billing descriptions provided sufficient notice to its client regarding the work that it performed to enable the client to scrutinize its work. DAI additionally points out that M-I never identified any particular entries as so vague that the

36

nature and reasonableness of the work could not be assessed.  Having reviewed the invoices, the Court agrees that the billing entries provide sufficient detail to discern whether excessive or unnecessary work was being done by Carlson Caspers. Therefore, the Court recommends against reducing the award based on inadequate billing descriptions.

Finally, the Court has reviewed the total hours recorded and fees billed by DAI's counsel on the case as a whole, and with the exceptions noted above does not find them unreasonable for a patent case of this kind, considering the duration, amount and intensity of motion practice, the extraterritorial issues, and the client's exposure.  Accordingly, the Court recommends that the fees requested be awarded save and except for the reductions specifically discussed herein.

## IV.    Litigation Costs

To start, M-I argues that DAI is not entitled to any award of costs.  M-I contends that Judge Tunheim awarded fees but not costs under § 285, and the only costs awarded were under Fed. R. Civ. P. 54(d).  Alternatively, M-I argues that even if the Court had granted costs under § 285, these expenses are only recoverable if shown to be "necessary for the case," *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1069 (Fed. Cir. 1983), and DAI has not attempted to show how its itemized costs were necessary.

DAI, of course, argues that the Court granted costs under § 285.  And while they do not attempt to explain how each category of costs was necessary for this litigation, DAI cites one case holding that costs under § 285 normally include travel, food, lodging,

telephone, mail, photocopying, facsimile, courier, filing fees, deposition transcripts, subpoena services, and other related services. *Vehicle Interface Techs. LLC*, 2016 U.S. Dist. LEXIS 77612, at \*13-14 (D. Del. June 15, 2016). Further, DAI has submitted extensive documentation accounting for the costs that were expended in this litigation, oftentimes in granular detail. (DAI Ex. 36 [Doc. No. 295-27].)

It is true that the Order adopting this Court's Report and Recommendation and granting DAI's motion "with regard to attorney fees and costs" does not expressly state under what statutory authority costs were being granted.  But the Order does note that DAI filed a motion for attorney fees, expert witness fees, and costs "[p]ursuant to 35 U.S.C. § 285, 28 U.S.C. § 1927, and the Court's inherent powers," in addition to moving for costs pursuant to Fed. R. Civ. P. 54(d). (Order adopting R&R at 1 [Doc. No. 281].) Moreover, the Order adopted this Court's Report and Recommendation, which recommended denying DAI's motion only as to expert witness fees and any other sanctions that might be sought under the Court's inherent authority or 28 U.S.C. § 1927. (R&R at 36-39 [Doc. No. 270].)  Nothing in the Report and Recommendation finding the case exceptional under § 285 drew a distinction between DAI's entitlement to attorneys' fees and its entitlement to costs under that section, nor does M-I point to authority justifying such a distinction.  Accordingly, the following discussion is based on the assumption that Judge Tunheim intended to award costs to the extent recoverable not only under Federal Rule of Civil Procedure 54(d) but also under § 285.

A.    **Legal Standard**

The Federal Rules of Civil Procedure authorize courts to award certain limited

costs in favor of the prevailing party. Fed. R. Civ. P. 54(d)(1), *see also* 28 U.S.C.

§§ 1920, 1821. Costs ordinarily involve smaller outlays than attorneys' fees and are more

easily calculable, *Evans*, 475 U.S. at 735; however, district courts retain "broad discretion

over the award of costs to a prevailing party," *Little Rock Cardiology Clinic PA v. Baptist

Health*, 591 F.3d 591, 601 (8th Cir. 2009). As a general rule, courts are limited to shifting

costs incurred by the prevailing party in six statutorily defined categories, which include

fees paid to the court clerk, fees paid for transcripts, certain docket fees, and expense

incurred for interpretation services. 28 U.S.C. § 1920.[14] Though courts are typically

limited to awarding costs that fall within one of those six categories, a different statute

may provide the court with authority to compensate the prevailing party for costs beyond

those authorized by the cost shifting statute. *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S.

---

[14] The federal cost shifting statute, 28 U.S.C. § 1920, specifically provides that:
A judge or clerk of any court of the United States may tax as costs the
following: (1) Fees of the clerk and marshal; (2) Fees for printed or
electronically recorded transcripts necessarily obtained for use in the case;
(3) Fees and disbursements for printing and witnesses; (4) Fees for
exemplification and the costs of making copies of any materials where the
copies are necessarily obtained for use in the case; (5) Docket fees under
section 1923 of this title; (6) Compensation of court appointed experts,
compensation of interpreters, and salaries, fees, expenses, and costs of
special interpretation services under section 1828 of this title. A bill of
costs shall be filed in the case and, upon allowance, included in the
judgment or decree.
*See also Grove v. Wells Fargo Fin. Cal., Inc*., 606 F.3d 577, 579–82  (9th Cir. 2010)
(discussing the difference between "taxable costs" under 28 U.S.C. § 1920 versus "non-
taxable costs" authorized under different statutory authority.)

83, 86 (1991) (holding that 28 U.S.C. § 1920 "define[s] the full extent of a federal court's power to shift litigation costs absent express statutory authority").

Section 285 is one such statute that authorizes courts to award costs more liberally than § 1920. Unlike the general cost shifting rules, § 285 applies only to exceptional cases, *i.e.,* ones brought in bad faith or without merit. *Mathis v. Spears*, 857 F.2d 749, 758 (Fed. Cir. 1988). Thus, the Federal Circuit has interpreted § 285 to require "the party acting exceptionally to bear the expenses of the opposing party" and to authorize reimbursement for all expenses incurred in the "preparation for and performance of legal services related to the suit." *Cent. Soya Co.*, 723 F.2d at 1578. Therefore, the scope of recoverable costs in exceptional cases under the Patent Act is broader than 28 U.S.C § 1920 in that costs are not limited to defined categories. *Maxwell*, 53 F. App'x at 569. The Court's task here, then, is to recommend an award of costs to DAI "to the extent that it deems proper to account for the expenses incurred . . . in connection with this suit." *Id.*

DAI seeks $46,832.77 in district court-related costs and $157,845.47 in costs associated with preparation of the IPR petitions. (M-I Ex.'s GG-PP [Doc. No. 327].) (containing spreadsheets that break out the alleged costs into different categories). The Court will examine the various types of costs sought below.

### B.    Fees Paid to the PTO for IPR Petitions

DAI seeks $157,845.47 in connection with its IPR petitions. These include six separate fee payments to the PTO ranging from $25,000 to $31,000. (DAI Ex. 36 at 85-89 [Doc. No. 295-27].) Although DAI does not explain exactly which fees it was

charged by the PTO, these payments appear to be in line with the typical fees charged by the PTO to institute IPRs. *See* U.S. Patent and Trademark Office, *USPTO Fee Schedule*, Fees and Payments (Jan. 22, 2018, 9:30 AM), https://www.uspto.gov/learning-and-resources/fees-and-payment/uspto-fee-schedule. However, as discussed above, the Court recommends against awarding DAI its attorneys' fees for those petitions. For the same reasons, it also recommends against granting the associated costs. If, on the other hand, the District Court decides it is appropriate to award DAI its attorneys' fees for the IPR petitions, then the associated costs sought by DAI are appropriate and should be reimbursed as well.

### C.   Translation Fees

DAI seeks $3,300 for the costs it incurred to translate various documents from English into Portuguese. (M-I Ex. GG at 67 [Doc. No. 327].) In opposing the award of costs for translation, M-I cites one case from the District of Massachusetts which states that translation costs may be reimbursed only where those documents are "used in evidence, used as part of the proceeding or otherwise reasonably necessary for trial preparation." *Haemonetics Corp. v. Fenwal, Inc.,* 863 F.Supp.2d 110, 118 (D. Mass. 2012). That case, however, bears little resemblance to the instant one. Unlike here, the district court in *Haemonetics* determined that the underlying patent lawsuit was not exceptional under § 285 and proceeded to assess whether translation costs should be awarded under 28 U.S.C. § 1920. In the instant case, the Court's task is to determine

whether the translation fees are compensable under the more liberal cost shifting standards of § 285.

On the other hand, DAI does little to demonstrate that the translation fees it incurred were reasonably necessary to its defense of the lawsuit. In cost shifting, the Court need not "become green-eyeshade accountants . . . to achieve auditing perfection" but must instead do "rough justice." *Fox v. Vice*, 563 U.S. 826, 838 (2011). DAI does not describe which documents were translated or provide an explanation for how those documents were used as part of the proceeding or reasonably necessary for trial preparation. Instead, DAI merely provides invoices for expenses paid to a translation service. (DAI Ex. 36 [Doc. No. 295-27].)  It may well be that a substantial portion, and perhaps all, of the translation fees incurred were expended in connection with the litigation at issue, but in the absence of any specific substantiation for that need, and in light of the possibility that DAI may have had other business reasons to translate documents into Portuguese for the convenience of Limitada, the Court recommends denying the request for reimbursement of $3,300 in costs associated with translating documents into Portuguese.

### D.    Prior Art Search and Patent and File History Orders

DAI seeks $2,958.75 in costs related to prior art searches and patent and file history ordering. (M-I Ex. II at 71 [Doc. No. 327].) The Federal Circuit has held that prior art search related expenses are not reimbursable costs under § 1920. *CBT Flint Partners, LLC v. Return Path, Inc.*, 737 F.3d 1320, 1333 (Fed. Cir. 2013). But because

prior art searches are a usual and important part of defending against patent infringement claims, the Court finds that the costs of such searches are appropriately recoverable under § 285. Further, the Court recognizes that hiring outside search firms to conduct prior art searches is a cost-effective alternative to using more expensive intellectual property attorneys. Indeed, it is likely M-I would have objected to a request for fees for prior art searching at Carlson Caspers' hourly rates. Accordingly, the Court finds that these costs are reasonable and are directly related to the litigation, and recommends that the full $2,958.75 sought for expenses related to prior art searches be included in the award.

### E.    Service of Process Costs

DAI seeks $242.30 for costs related to service of a third-party subpoena on Macawber Engineering. (DAI Ex. 36 at 47 [Doc. No. 295-27].) M-I cited one Eighth Circuit case, which held that § 1920 does not contain any provision for the recovery of costs for a special process server. *Crues v. KFC Corp.*, 768 F.2d 230, 234 (8th Cir. 1985). Judge Thorson found similarly in a 2016 case. *Mountain Mktg. Grp., LLC v. Heimerl & Lammers, LLC*, No. 14-cv-846 (SRN/BRT), 2016 WL 424964, at *1 (D. Minn. Feb. 3, 2016). Again, however, this Court has concluded that DAI is also entitled to recover costs under § 285. But DAI offers no explanation whatsoever about the need for this subpoena is this case. Perhaps Macawber Engineering was in possession of information useful to DAI in preparing its defense. However, in the absence of any explanation, the Court cannot conclude that costs incurred to issue the subpoena to

Macawber Engineering are directly related to the litigation at issue. The Court therefore recommends that DAI not be reimbursed for these costs.

### F.    Data Hosting and Management

DAI seeks $15,032.06 for data hosting and management, including document imaging, hosting, processing, and management services, as well as support of Carlson Caspers' employees in using its Digital War Room system. (M-I Ex. JJ at 73 [Doc. No. 327].) The Federal Circuit has held that data hosting and management costs are not recoverable under §1920. *CBT Flint Partners*, 737 F.3d at 1330-32.  Again, however, the Court also considers whether the costs are appropriately recoverable under § 285.   M-I concedes that costs incurred by DAI in connection with the production of DAI's documents in discovery would be reimbursable, but the invoices show DAI was not charged for those costs or, apparently, for any of the data hosting and management costs that DAI now seeks to recover.  *See, e.g.* (DAI Ex. 36 at 70 [Doc. No. 295-27].)   If Carlson Caspers did not bill those costs to DAI, the Court is not persuaded that M-I should be required to "reimburse" them.  Presumably, those costs, like other overhead, are reflected instead in the hourly rates charged by Carlson Caspers, for which M-I will be responsible.  Accordingly, the Court recommends that DAI not be reimbursed for these costs.

### G.    Printing

DAI seeks $5,736.39 for printing costs. (M-I Ex. LL at 77 [Doc. No. 327]; M-I Ex. MM at 79 [Doc No. 327].)  M-I assumes that all of these expenses are related to "copies"

as that term is used in Fed. R. Civ. P. 54(d) and § 1920, but M-I correctly points out that

DAI has made no showing that these copies were reasonably necessary for use in the

case. For example, one of the larger expenses contained in the printing invoices is

described as "B/W & Color Blowbacks – Xact Data Discoveries." (M-I Ex. LL [Doc. No.

327].)  With little more than the invoices provided by DAI to go by, the Court is left to

rely on its "broad discretion over the award of costs to a prevailing party." *Little Rock*

*Cardiology*, 591 F.3d at 601. It is likely that a significant portion of these costs were

reasonably incurred in preparation for litigation, but DAI's limited showing leaves room

for doubt. For this reason, the Court recommends reducing the award of "printing" costs

by 50% for a total of $2,868.20.

### H.    Court Reporter and Transcript Fees

DAI seeks $14,097.55 in costs for court reporter and transcript fees, but M-I

argues that DAI does not explain why these depositions were necessarily obtained for the

case. Again, DAI has provided the Court with little information outside of invoices to

determine that these expenses were made in preparation of litigation. Nevertheless,

because a purpose of § 285 is to "compensate the prevailing party for its monetary

outlays" in defending against exceptionally meritless cases, *Cent. Soya Co.*, 723 F.2d at

1578, the Court finds that these costs, based on their nature, were almost certainly

expended in preparation for this litigation. Additionally, the invoices provide sufficient

descriptions to discern that the court reporter and transcript fees relate to this case. For

instance, the largest expense recorded on the invoices is for a court reporter for a

45

deposition of an M-I engineer. (M-I Ex. NN [Doc. No. 327].)  The Court is satisfied that DAI has sufficiently established that the court reporter and transcript fees were expenses necessarily incurred in preparation for litigation, and the Court therefore recommends awarding the full $14,097.55 in costs for court reporter and transcript fees.

### I.    Courier and FedEx Delivery Fees

DAI also seeks reimbursement of $605.22[15] for postage and courier fees, including $445.47 in charges apparently related to the IPR petitions. (M-I Ex.'s MM, OO [Doc. No. 327]; DAI Ex. 36 at 90 [Doc. No. 295-27].)  M-I argues that none of these costs are reimbursable under § 1920.  DAI provides the Court with little basis to verify that these costs were incurred in connection with the litigation or, even if so, that they were reasonably necessary. (*See, e.g.,* DAI Ex. 36 at 74 [Doc. No. 295-27].)  As an initial matter, the Court has already determined that fees and costs related to the IPR petitions should not be awarded, and the Court correspondingly finds that costs related to those petitions should also be excluded from the award.  It is not difficult to conclude, however, that in a litigation of the length and intensity of this one, particularly one that involved obtaining documents from another country, the remaining $159.75 was reasonably related to this case. Therefore, the Court recommends that $159.75 for postage and courier fees should be included in the award of costs pursuant to § 285.

---

[15] M-I arrived at this number by adding $8.19 postage costs detailed in in Exhibit MM [Doc. No. 327], $151.56 in courier costs detailed in Exhibit OO [Doc. No. 327], and $445.47 in FedEx fees detailed on page 90 of DAI Exhibit 36 [Doc. No. 295-27].

J.     **Travel Expenses**

Finally, DAI seeks $5,331.41 in travel expenses for out-of-town depositions, local

travel, and parking for hearings. DAI submitted receipts containing detailed information

regarding the travel expenses it incurred in traveling from Minneapolis to Houston to

conduct depositions. (DAI Ex. 36 at 52–66 [Doc. No. 295-27].)  A review of those

records indicates that its travel expenses were reasonable. For instance, Carlson Caspers

did not over-lawyer the depositions, utilizing one senior partner and one junior associate.

(DAI Ex. 36 at 52–53, 56–57 [Doc. No. 295-27].) The surrounding circumstances of the

expenses also indicate that the depositions were necessarily related to this litigation,

because M-I is located in Houston and thus the depositions needed to take place there.

Nor do the records indicate that the traveled first class, stayed in lavish surroundings, or

billed their client for extravagant meals or amenities.  Accordingly, the Court finds that

DAI is entitled to full reimbursement of the travel costs.

## V.    Recommendation

Based on the foregoing and all of the files, records, and proceedings herein, **IT IS**

**HEREBY RECOMMENDED** that Defendant Dynamic Air Inc.'s Motion for Attorney

Fees and Costs [Doc. No. 285] be **GRANTED IN PART** and **DENIED IN PART**.

Specifically, the Court recommends:

1. **GRANTING** attorneys' fees in the amount of $1,332,087.57 under 35 U.S.C. §

285 to DAI for the expenses it incurred in litigation before the District Court,

which is arrived at by taking the total attorneys' fees of $1,563,118 for the District Court litigation and subtracting:

a. $50,000 for fees relating to disputes about the production of engineering drawings and information concerning the Limitada systems following the pretrial scheduling conference;

b. $35,870.63 for unnecessary work to prepare and file a premature summary judgment motion;

c. $32,856 for hours billed in connection with unasserted antitrust and Rule 11 claims;

d. $112,303.80 for excessive preparation for the hearing on attorneys' fees; and

2. **GRANTING** costs in the amount of $24,702.44 under 35 U.S.C. § 285 to DAI for the expenses it incurred before the District Court, which is arrived at by taking the total request for $46,832.77 in costs and subtracting:

a. $3,300 for translation fees not demonstrated to be directly related to the litigation at issue;

b. $242.30 for costs related to service of a third-party subpoena on Macawber Engineering;

c. $15,032.06 for data hosting and management costs not demonstrated to be directly related to the litigation at issue;

     c. $2,868.20 for printing costs not demonstrated to be directly related to the

litigation at issue;

     d. $445.47 for postage and courier costs expended to submit the IPRs; and

3. **DENYING** $302,548.50 in attorneys' fees and $157,845.47 in costs associated

with the preparation and submission of its IPR petitions.

Dated: January 26, 2018         _s/ Hildy Bowbeer_____
                                   HILDY BOWBEER
                                   United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).